Annette M. FERGUSON, Plaintiff,

v.

Michael J. ASTRUE,[1] Commissioner of
the Social Security Administration,
Defendant.

Case No. 07–C–0044.

United States District Court,
E.D. Wisconsin.

Feb. 6, 2008.

1. The court has amended the caption to substitute Michael J. Astrue, Commissioner of the Social Security Administration, as the defendant in this case. On February 12, 2007, Michael J. Astrue became Commissioner of the Social Security Administration. Pursuant to Fed.R.Civ.P. 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is automatically substituted as the defendant in this action.

Karen S. Roehl, Legal Action of Wisconsin Inc., Oshkosh, WI, for Plaintiff.

Brian E. Pawlak, United States Department of Justice, Office of the U.S. Attorney, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

PATRICIA J. GORENCE, United States Magistrate Judge.

### NATURE OF CASE

The plaintiff, Annette M. Ferguson, commenced this action on January 12, 2007, seeking judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner), pursuant to 42 U.S.C. § 405(g), denying her applications for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act. The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General LR. 73.1 (E.D.Wis.). The plaintiff's appeal will be addressed herein.

### PROCEDURAL HISTORY

On August 23, 2003, the plaintiff filed applications for disability insurance benefits and supplemental security income, alleging that she became disabled on November 2, 2001, due to hand and wrist problems and depression. The plaintiff's applications were denied initially and upon reconsideration. Pursuant to the plaintiffs request, a hearing was held before an Administrative Law Judge (ALJ) on August 31, 2005. The plaintiff appeared and testified and was represented by counsel. A vocational expert also testified.

In an April 21, 2006, decision, the ALJ found that the plaintiff met the disability insured status requirements of the Social Security Act on November 2, 2001, the date she alleges she became disabled and has not engaged in substantial gainful activity since that date. He noted that at the time she alleged she became disabled, the plaintiff was 36 years old, defined in the regulations as a "younger individual," had a tenth grade education and had not acquired any transferable skills.

The ALJ determined that the medical evidence established that the plaintiff has upper extremity tenosynovitis, an impairment which is "severe" within the meaning of the regulations, but that she does not have an impairment or combination of impairments which meet or equal the criteria of any of the listed impairments described in 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ found that the plaintiff's assertions concerning her impairments and their impact on her ability to work were not credible. He also found that the plaintiff retains the residual functional capacity to lift and carry no more than ten pounds, to sit approximately six hours in an eight-hour workday and to stand and walk approximately six hours in an eight-hour workday. He stated that she should avoid continuous forceful gripping and continuous flexion and extension of the left elbow.

The ALJ concluded that the plaintiff is unable to perform her past relevant work as a certified nurse's aide, sewing machine operator and convenience store cashier. Using Medical–Vocational Rules 202.18 and 201.25 as a framework for decision-making, the ALJ also concluded that the plaintiff is capable of making a successful vocational adjustment to work which exists in significant numbers in the national economy. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review.

The history of this case is well summarized in the record. Consequently, the court will only engage in a limited discussion of the facts relevant to this decision.

### APPLICABLE LAW

The Social Security Act authorizes disability benefits for those who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a plaintiff must demonstrate that her physical or mental impairments prevent her from doing not only her previous work, but any other substantial gainful employment which exists in the national economy considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

 In order to determine whether a plaintiff is so disabled, the ALJ is required to evaluate in sequence: 1) whether the plaintiff is currently unemployed; 2) whether the plaintiff has a severe impairment; 3) whether her impairment meets or equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the Listings), which the Commissioner acknowledges to be conclusively disabling; 4) whether the plaintiff possesses the residual functional capacity (RFC) to perform her past relevant work; and 5) whether the plaintiff is capable of performing any other work existing in significant numbers in the national economy given her age, education, and work experience. *See Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000); *Knight v. Chater,* 55 F.3d 309, 313 (7th Cir.1995); *Wolfe v. Shalala,* 997 F.2d 321, 322–3 (7th Cir.1993). If a plaintiff satisfies steps one, two and three, she will automatically be found disabled. If a plaintiff satisfies steps one and two, but not three, then she must demonstrate that she lacks the residual functional capacity to perform her past work. Once step four is satisfied, the burden shifts to the Commissioner to establish that the plaintiff is capable of performing work in the national economy. *Knight,* 55 F.3d at 313. The plaintiff bears the burden at steps one through four, after which at step five, the burden shifts to the Commissioner. *Briscoe v. Barnhart,* 425 F.3d 345, 352 (7th Cir.2005); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir.2004). The process is sequential and if the ALJ can make a conclusive finding at any step that the claimant either is or is not disabled, then the ALJ need not progress to the next step. 20 C.F.R. § 404.1520(a)(4).

To expedite the carrying of this burden, the Commissioner has promulgated 20 C.F.R. Part 404, Subpart P, App. 2, the "Medical–Vocational Guidelines," commonly referred to as the "grid." The rules of the "grid" reflect the analysis of the various vocational factors (that is age, education and work experience) in combination with the individual's residual functional capacity (her maximum sustained work capability for sedentary, light, medium, heavy or very heavy work) in evaluating the individual's ability to engage in substantial gainful activity in other than her vocationally relevant past work.

 Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is disabled. *See Haynes v. Barnhart,* 416 F.3d 621, 627 (7th Cir.2005). However, each of these findings of fact is subject to rebuttal and the individual may present evidence to refute said findings. Where any of the findings of fact do not coincide exactly with the corresponding criteria of a rule, the rule does not apply in that particular case

and, accordingly, does not direct a conclusion of disabled or not disabled. *Id.* at 627–8.

■ Nonetheless, the Commissioner is permitted to conclude that a nonexertional limitation, while present, has no significant impact on an individual's capacity to perform the range of work she is otherwise exertionally capable of performing, making proper application of the grid. *Caldarulo v. Bowen,* 857 F.2d 410, 413 (7th Cir.1988) (citing *Smith v. Schweiker,* 735 F.2d 267, 272 n. 3 [7th Cir.1984] ). In any event, there must be reliable evidence of some kind which would persuade a reasonable person that the limitations in question do not significantly diminish the employment opportunities otherwise available. *Ehrhart v. Secretary of Health and Human Services,* 969 F.2d 534, 540 (7th Cir.1992) (citing *Warmoth v. Bowen,* 798 F.2d 1109, 1112 [7th Cir.1986] ).

■ Review of the Commissioner's decision is limited. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir.2004). The Social Security Act specifically provides that the findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. *Jones v. Shalala,* 10 F.3d 522, 523 (7th Cir.1993); *see* 42 U.S.C. § 405(g). "Although a mere scintilla of proof will not suffice to uphold an ALJ's findings, the substantial evidence standard requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Blakes v. Barnhart,* 331 F.3d 565, 568 (7th Cir.2003); *see also, Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir.2001).

■ In reviewing the decision of the Commissioner, this court is obligated to review all the evidence contained in the record and such review "must be more than an uncritical rubber stamp." *Delgado v. Bowen,* 782 F.2d 79, 82 (7th Cir. 1986). This court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Powers v. Apfel,* 207 F.3d 431, 434 (7th Cir.2000). However, even if substantial evidence supports the Commissioner's findings, this court may reverse if the ALJ committed an error of law. *White v. Apfel,* 167 F.3d 369, 373 (7th Cir.1999).

## ANALYSIS

In this case, the ALJ conducted the standard five-step evaluation process to determine whether the plaintiff is disabled. On appeal, the plaintiff argues that the ALJ failed to meet the substantial evidence standard in determining the severity of her mental impairments and in weighing the last of four opinions of her treating physician. The plaintiff further argues that the ALJ did not properly assess her credibility and failed to prove that work that the plaintiff could perform exists in significant numbers in the national economy. Finally, the plaintiff argues that her case should be remanded for the Commissioner to consider new and material evidence.

In response, the Commissioner asserts that substantial evidence supports the ALJ's decision regarding the plaintiff's mental impairments. The Commissioner contends that the ALJ properly afforded the weight that he did to the fourth opinion of the plaintiff's treating physician because, as noted by the ALJ, the opinion was not consistent with the physician's prior opinions and not based on objective evidence. The Commissioner also contends that the ALJ reasonably determined that the plaintiff's claims were not credible to the extent they preclude sedentary, unskilled work and that he adequately articulated his reasons for that determination. The Commissioner further asserts that the ALJ established that there are a significant number of jobs in the economy that the plaintiff can perform. Finally, the

Commissioner maintains that the additional evidence submitted by the plaintiff is neither new nor material and that the plaintiff "has failed to explain why she waited almost fourteen months after the hearing to finally (August 2005 to October 2006) seek testing from Dr. Kaplan." (Memorandum in Support of the Commissioner's Decision [Commissioner's Memorandum] at 20).

### 1. Whether Substantial Evidence Supports the ALJ's Findings Regarding the Plaintiff's Mental Impairments.

The plaintiff asserts that the ALJ erred in concluding that her mental impairment of depression is "not severe." The plaintiff contends that the "record is replete with references to [the plaintiff] suffering from depression and being treated for depression for years." (Brief of Plaintiff at 9). The Commissioner contends that the plaintiff employs a false premise—that a diagnosis of "major" depression in a clinical setting equates to a severe mental impairment under the regulations of the Social Security Administration. (Commissioner's Memorandum at 10). The Commissioner states that "major" depression is a term of art that is defined differently in the clinical setting as compared to the regulations of the Social Security Administration. The Commissioner further asserts that the ALJ's finding that the plaintiff's mental impairment of depression is not severe is supported by substantial evidence.

An impairment or combination of impairments is not severe "if it does not significantly limit [the plaintiffs] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities" means the abilities and aptitudes necessary to do most jobs such as understanding, carrying out and remembering simple instructions, using judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. *Id.* at § 404.1521(b)(3)-(6).

The ALJ noted that the medical evidence demonstrates that the plaintiff is currently being prescribed Effexor and Risperdal for complaints of depression accompanied by dysphoria, anhedonia, poor sleep and appetite, irritability, ruminations, anger, social anxiety and isolations, and decreased energy. (Tr. 24, citing Exhs. 11E, 2F, 3F, 7F, 17F, 18F and 22F). The ALJ noted, however, that the plaintiff is alert, oriented, logical, coherent, and goal directed on mental status examinations. (Tr. 24). The ALJ further determined that the medical evidence failed to document abnormal thought processes, grandiosity, ideas of reference, pressured speech, loosening of associations, psychomotor agitation or retardation, impaired memory, suicidal or homicidal ideation, tangential or circumstantial thought processes, or difficulty maintaining attention and concentration. (Tr. 24, citing Exh. 7F, 18, and 22F).

The ALJ considered the October 2003, opinion of consultative psychologist, Steven Krawiec, Ph.D. (Tr. 25, citing Exh. 7F). Dr. Krawiec noted that the plaintiff's "speech was well organized, understandable and goal-directed. Her affect was bland and she seemed rather dispirited." (Tr. 203). Dr. Krawiec stated that "her mood disturbance is such that it might adversely affect her ability to consistently muster the energy and effort to get into and remain in the workplace. That would relate to her ability to persist at tasks and maintain adequate pace." (Tr. 206). Dr. Krawiec stated that the plaintiff "has adequate cognitive capacity to manage simple job instructions. Significant problems with attention, concentration, or memory were not in evidence." (Tr. 206). Dr. Krawiec further stated that "I do not have

reason to think that typical workplace changes would be necessarily problematic for her. I do not have any reason to think that she would have trouble with co-workers [or] supervisors." (Tr. 206). Dr. Krawiec diagnosed the plaintiff with Major Depression and a Global Assessment Functioning score of 52.

The ALJ gave considerable weight to Dr. Krawiec's opinion and in particular the portion that stated that the plaintiff has the cognitive ability to manage at least simple job instructions and would have no difficulty tolerating typical work place changes and interacting with coworkers and supervisors. (Tr. 25). The ALJ further discussed that the plaintiff recently had been receiving individual psychotherapy, but that the evidence failed to document that the plaintiff ever required psychiatric hospitalization or that she ever sought, required or received formal psychotherapy prior to February 2005. (Tr. 25, citing Exh. 18F). The ALJ stated that "[g]lobal assessment functioning scores of 52 and 58 have indicated only moderate limitations at best." (Tr. 25). Moreover, the plaintiff's condition has improved with treatment. (Tr. 25, citing Exh. 18F).

The ALJ determined that with respect to the criteria in paragraph "B" of the listing of mental impairments, which address the functional limitations arising from psychiatric disorders, the plaintiff has "mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and mild limitations in maintaining concentration, persistence or pace." (Tr. 25). The ALJ further noted that there is no evidence of episodes of decompensation in a work or work-like setting. (Tr. 25). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The ALJ concluded that the evidence does not demonstrate that the plaintiff's depression has resulted in more than minimal limitations in her ability to perform basic work activi-

ty. Thus, the ALJ determined that the plaintiff's depression is "'not severe' as that term is defined in the Social Security Act and Regulations (20 C.F.R. § 404.1521(a) and 416.921(a))." (Tr. 24).

The plaintiff asserts that the ALJ's finding that the plaintiff's mental impairments are "not severe" is not based on substantial evidence. The plaintiff argues that "[o]ne only receives a diagnosis of 'Major depression' if the depression is 'severe.'" (Brief of Plaintiff at 10). The plaintiff, however, provides no citation or support for her argument. As argued by the Commissioner, a clinical diagnosis of "major depression" involves determining the presence of depressed mood, reduced interest in activities that used to be enjoyed, sleep disturbances, loss of energy, difficulty concentrating, holding a conversation, paying attention, or making decisions, and suicidal thoughts or intentions. (Commissioner's Memorandum at 24, citing American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders & V–TR* at 356 [4th ed. rev. text 2000] ).

A "severe impairment" finding, however, involves not only confirming the presence of the above symptoms (and other symptoms), but also determining whether these symptoms have resulted in a marked restriction on a person's activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and an inquiry into whether the person has experienced any repeated episodes of decompensation each of extended duration. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. A mental impairment is not severe if it does not significantly limit the plaintiff's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a).

In this case, the ALJ's finding that the plaintiff does not have a severe mental impairment as defined in the regu-

lations of the Social Security Administration, is supported by substantial evidence. The ALJ's adequately articulated his reasons for determining that the plaintiff did not suffer from a "severe impairment." In particular, the ALJ found that the evidence does not demonstrate that the plaintiff's depression has resulted in more than minimal limitations in her ability to perform basic work activities. This court has the authority to review the decision of the ALJ to determine if it is reasonably supported by the record; it may not weigh the evidence anew. *See Powers,* 207 F.3d at 434. The ALJ's determination that the plaintiff's mental impairments are not severe, based on the record that was before the ALJ, is supported by substantial evidence and will not be disturbed.

The plaintiff also submits a psychological evaluation from Steven Kaplan, Ph.D. to argue that the plaintiff's mental impairments are severe. The ALJ, however, never reviewed this evaluation. The court will address the plaintiff's allegation that Dr. Kaplan's evaluation constitutes new and material evidence further in this decision in the context of considering whether a remand is warranted based on this evidence. *Binion v. Shalala,* 13 F.3d 243, 246 (7th Cir.1994) ("the court cannot reverse the Secretary's decision on the basis of any new evidence ... such evidence would weigh heavily in determining whether a remand is necessary").

## 2. Whether The ALJ Properly Evaluated the Opinion of the Plaintiff's Treating Physician.

A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by the medical findings and consistent with other substantial evidence in the record. *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir.2004); *Dixon v. Massanari,* 270 F.3d 1171, 1177 (7th Cir.2001); *Clifford,* 227 F.3d at 870;

*see also* 20 C.F.R. § 404.1527(d)(2); SSR 96–8p. "Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." *Knight,* 55 F.3d at 314 (citing 20 C.F.R. § 404.1527[c]; *Luna v. Shalala,* 22 F.3d 687, 690 [7th Cir.1994]; *Castellano v. Secretary of Health & Human Servs.,* 26 F.3d 1027, 1029 [10th Cir.1994] ). The ALJ "must articulate, at some minimum level, [his] analysis of the evidence." *Dixon,* 270 F.3d at 1176 (citing *Zurawski,* 245 F.3d at 888). The ALJ is not required to address every piece of evidence or testimony, but the ALJ must provide "some glimpse into [his] reasoning." *Id.* (citing *Zurawski,* 245 F.3d at 889). An ALJ may discount a treating doctor's medical opinion if it is internally inconsistent, as long as he "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek,* 390 F.3d at 503 (quoting *Clifford,* 227 F.3d at 870).

Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of treating physicians. *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). In any event, a treating physician's statement that the claimant is disabled cannot itself be conclusive; the ultimate determination of whether a claimant is disabled is "reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(e)(1); *see also, Dixon,* 270 F.3d at 1177 ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work. The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled." [internal citations omitted] ).

In this case, the plaintiff has bilateral upper extremity pain due to tenosynovitis.

(Tr. 25). On August 30, 2000, the plaintiff underwent a DeQuervain's tendon release to her right wrist. (Tr. 151, 172). The surgery was performed by David R. Jones, M.D., who ordered light duty work with no repetitive grasping after the surgery. (Tr. 151).

On July 12, 2001, the plaintiff began treatment with David A. Toivonen, M.D., a hand specialist. Dr. Toivonen limited the plaintiff to "lighter duty work, sedentary, with no pinching/gripping, no flexion/extension of the elbow or wrist and no high force gripping. She has a 5 lb. maximum weight lifting restriction." (Tr. 172). On August 9, 2001, Dr. Toivonen continued the plaintiff on her present restrictions. (Tr. 171). On November 1, 2001, Dr. Toivonen set the following restrictions: "sedentary, nonrepetitive, left elbow/wrist motion; nonrepetitive pushing and pulling; and no forceful gripping." (Tr. 169). On December 27, 2001, Dr. Toivonen stated that the plaintiff's prognosis is "fair due to her chronic pain.... She does have permanent restrictions of sedentary work, no repetitive activities with the left elbow, and no high force gripping." (Tr. 168). On March 23, 2004, in a letter to plaintiff's attorney, Dr. Toivonen noted that he had not seen the plaintiff since 2001, and "would not alter the opinions given on that date." (Tr. 265). On January 19, 2005, Dr. Toivonen restricted the plaintiff to sedentary work and opined that she should avoid constant high force gripping, repetitive motions and flexion and extension of the wrist. (Tr. 302).

On August 31, 2005, Dr. Toivonen filled out a Medical Assessment Form and stated that the plaintiff can occasionally lift ten pounds, but can never lift twenty pounds. In addition, Dr. Toivonen opined that the plaintiff is incapable of grasping, turning or twisting objects with the right hand for more than 30% of an eight-hour workday, incapable of grasping, turning or twisting of objects with the left hand for more than 20% of an eight-hour workday, may not perform high force gripping and may not perform repetitive reaching, handling or fingering. (Tr. 292–296).

On October 13, 2003, a consultative physician, Ward Jankus, M.D., filed a Disability Report. Dr. Jankus opined that the plaintiff is capable of lifting and carrying 10 pounds using both arms together and should avoid continuous flexing and extending motions of the left elbow as well as high force constant gripping. (Tr. 210).

In evaluating the medical evidence, the ALJ afforded great weight to the August 2001, March 2004, and January 2005, opinions of Dr. Toivonen limiting the plaintiff to sedentary work and stating that she should avoid flexion and extension of the elbow and wrist while also avoiding high force grasping. The ALJ determined these opinions were well supported and consistent with the medical evidence. However, the ALJ gave less weight to the August 2005, opinion of Dr. Toivonen because the ALJ found that the degree of limitation was not supported by Dr. Toivonen's own objective findings on examination and was inconsistent with his previous statements that the plaintiff was capable of gripping 35 pounds with the right hand and 30 pounds with the left hand. The ALJ further found that this August 2005, opinion was inconsistent with Dr. Toivonen's June 2002, statement that the plaintiff's left upper extremity symptoms were relatively vague and somewhat inconsistent with her physical examination.

The ALJ also relied on the opinions of Dr. Jones and Dr. Jankus which stated that the plaintiff was capable of lifting and carrying ten pounds while avoiding repetitive wrist use, flexion and extension of her left elbow and high force gripping. The ALJ gave both opinions "considerable weight" as he found them to be consistent

with the record as a whole. (Tr. 26). The ALJ also determined that the findings of the medical experts at the state Disability Determination Services were inconsistent with the overall medical record, and therefore, the ALJ gave less weight to those findings.

■ The plaintiff argues that the ALJ erred by not giving appropriate controlling weight to Dr. Toivonen's August 2005, opinion. The first three opinions of Dr. Toivonen, the opinion of Dr. Jankus and the opinion of Dr. Jones are consistent—all restrict the plaintiff to lighter work, "sedentary" and state that the plaintiff should be limited to no repetitive motions and no constant high force gripping. (Tr. 149, 175, 209–10, 265, 302). Dr. Toivonen's August 2005, opinion similarly limits the plaintiff to occasionally lifting and carrying a maximum of ten pounds. (Tr. 296). The ALJ stated that Dr. Toivonen, in his August 2005, opinion, found that the plaintiff was incapable of lifting and carrying ten pounds, but the ALJ misread this portion of the August 2005, opinion. (Tr. 25–26). The August 2005, opinion concluded that the plaintiff can occasionally lift and carry ten pounds. An accurate reading of the August 2005, opinion underscores the overall consistency of the medical record. The ALJ's misstatement of Dr. Toivonen's August 2005, opinion regarding the plaintiff's carrying capacity does not call into question the ALJ's conclusion.

The ALJ further noted the degree of limitation set forth in the August 2005 opinion, namely that the plaintiff was incapable of lifting and carrying ten pounds, grasping with her right hand more than 30% of an eight-hour work day and grasping with her left hand more than 20% of an eight-hour work day, as well as other restrictions. He found that such limitations are not supported by Dr. Toivonen's objective findings and are inconsistent with his previous statements that the plaintiff was capable of gripping 35 pounds with the right hand and 30 pounds with the left hand. The plaintiff maintains that the ALJ misconstrues a maximum grip strength of 30 pounds with an ability to do this on a consistent basis. The ALJ, however, also concludes that Dr. Toivonen's August 2005, opinion was inconsistent with the June 2002, statement that the plaintiff's left upper extremity symptoms "were relatively vague and somewhat inconsistent with her physical examination." (Tr. 26). The ALJ reasonably found these additional limitations inconsistent with the record as a whole since Drs. Toivonen, Jones or Jankus never previously offered any similar restrictions. In addition, no objective evidence was cited by Dr. Toivonen to support the additional restrictions.

The plaintiff asserts that because the ALJ found Dr. Toivonen's August 2005, opinion inconsistent with the record, the ALJ was obligated to contact Dr. Toivonen for clarification. (Brief of Plaintiff at 12). An ALJ is only required to recontact a medical source "[w]hen the evidence we receive ... is inadequate for us to determine whether you are disabled." 20 C.F.R. § 404.1512(e). Here, the ALJ had adequate medical evidence, namely, five opinions setting forth consistent limitations, for determining that the plaintiff was capable of sedentary work. Therefore, there was no requirement that the ALJ contact Dr. Toivonen. In conclusion, the ALJ adequately articulated his reasons regarding the weight he gave to the opinion of Dr. Toivonen.

### 3. Whether the ALJ Properly Assessed the Plaintiff's Credibility

■ In assessing a plaintiff's credibility, an ALJ considers, among other things, the nature, location, onset, duration, frequency, radiation, and intensity of any pain; the type of dosage, effectiveness

and side effects of any medication; treatment, other than medication, the individual has received for relief of pain; the individual's daily activities; any inconsistencies in the record; and whether the plaintiff's testimony conflicts with the rest of the evidence. 20 C.F.R. § 404.1529(c)(3–4); SSR 96–7p. Pursuant to SSR 96–7p, the ALJ's determination or decision regarding a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers, the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887 (quoting SSR 96–7p). The court in *Zurawski* further stated that "[i]n this regard it is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* at 887. It is also not enough for the adjudicator to simply recite the factors that are described in the regulations for evaluating symptoms, *Id.* The ALJ must build an accurate and logical bridge from the evidence to the conclusion. *Dixon*, 270 F.3d at 1176; *Clifford*, 227 F.3d at 872.

The plaintiff contends that the ALJ erred in assessing her credibility because he addressed an inadequate number of factors set forth in SSR 96–7p and failed to adequately articulate his reasoning. The ALJ, however, specifically mentioned SSR 96–7p and its factors and his decision reveals that he considered the relevant factors.

The ALJ analyzed the medical evidence and concluded that the medical evidence failed to document that the plaintiff's upper extremity impairments have resulted in the degree of pain and limitations alleged. (Tr. 27). The medical evidence demonstrated that while the plaintiff has been diagnosed with bilateral tenosynovitis, she was "neurologically intact on examination" and radiographic and electrodiagnostic studies produced negative findings. (Tr. 27, citing Exhs. 13E, 1F, 3F, 8F, 15F, 17F, 19F, 20F, 21F, 22F, 26F). Thus, the medical evidence failed to document the existence of an impairment which could reasonably be expected to cause the limitations as alleged by the plaintiff.

With respect to medication, the ALJ noted that the plaintiff "had not been prescribed narcotic pain medications, and takes only over the counter Tylenol and Advil for her allegedly disabling pain." (Tr. 27, citing 11E, 8F, 17F and 26F). The plaintiff contends that the plaintiff has used Tylenol 3 with codeine. However, there is no cite to the medical record before the ALJ documenting a narcotic being prescribed or used by the plaintiff.[2] When the plaintiff met with Dr. Jankus on October 13, 2003, he stated that "[s]he does not take any medicines now because she was told in the past that she was just going to have to learn how to live with the pain." (Tr. 208). As noted by the ALJ, as of November 2001, the plaintiff's upper extremity symptoms were reasonably well controlled and by February 2005, her left upper extremity symptoms were moderately improved. (Tr. 27, citing Exhs. 1F, 3F, 17F).

As for the plaintiff's mental impairments, the ALJ noted that the plaintiff had recently been receiving individual psychotherapy and is currently prescribed Effexor and Risperdal for complaints of depression. (Tr. 27, citing Exhs. 11E, 2F, 3F, 7F, 17F, 18F, and 22F). The ALJ

---

**2.** The court notes that the evaluation of Steven Kaplan, Ph.D., (the new evidence submitted by the plaintiff to the Appeals Council and this court) states that the plaintiff utilizes Tylenol 3 with codeine. (Tr. 342 [Exh. A–1]).

further noted that the evidence fails to document psychiatric hospitalization or that the plaintiff "sought, required, or received formal psychotherapy prior to February 2005." (Tr. 27). The plaintiff contends that the she was hospitalized and the court notes that the records of Dr. Patel document an overdose on Prozac and "voluntary admission to MMC in early 1990s (first & last)." (Tr. 282). The ALJ found that the medical evidence submitted shows that the plaintiff had Global Assessment of Functioning (GAF) scores of 52 and 58 which indicate only moderate limitations at best. Moreover, medical records dated June 21, 2005, showed some improvement in the plaintiff's condition. (Tr. 285).

The ALJ also discussed the plaintiff's activities of daily living and stated that "the evidence demonstrates that she is capable of performing a full range of activities of daily living." (Tr. 27). The ALJ noted that the plaintiff cares for her personal needs, cares for her children, prepares meals, washes dishes, does laundry and housecleaning, manages money, pays bills, shops and drives. The ALJ further noted that the plaintiff watches television two to six hours a day, reads, listens to music, swims and uses a computer. The plaintiff talks on the phone and socializes with friends and family. (Tr. 27). The ALJ determined that the plaintiff's activities of daily living "contradict the nature and degree of impairment she alleges, and further undermine her credibility." (Tr. 27).

The plaintiff testified that she has problems with activities due to constant pain and that the pain in her hands is nine when she tries to use her hands. (Tr. 363). The plaintiff testified that it takes her longer to do simple chores because she needs to take frequent breaks due to pain. (Tr. 363–65). The plaintiff has difficulty opening up cans or jars, vacuuming and lifting a coffee pot. (Tr. 364). The plain-

tiff frequently drops dishes when washing them, cooks simple meals where stirring is not required, and avoids clothing with buttons which she finds difficult to manipulate. The plaintiff can type three or four sentences on a computer before her hands start to hurt. The plaintiff requires family members to help her with grocery shopping because she does not like "everybody staring at me." (Tr. 367). She also testified that she does not go anywhere because she feels as if people are staring at her, although she sees her sister once or twice a month. The plaintiff testified that "I just stay in the house and the curtains are pretty much closed all the time." (Tr. 367).

The ALJ properly considered the objective medical evidence, as well as the non-medical evidence, when he discounted the plaintiff's subjective complaints. *See Dixon*, 270 F.3d at 1178. Although the plaintiff's testimony lends support to her alleged limitations, if evidence both supports and detracts from the plaintiff's allegations, "the resolution of competing arguments based on the record is for the ALJ, not the court." *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir.2002). Here, the ALJ adequately considered the relevant factors in making his credibility determination. The ALJ's credibility determination is entitled to special deference because the ALJ is in the best position to see and hear the plaintiff and assess her forthrightness. *Powers*, 207 F.3d at 435. Therefore, the court concludes that the ALJ's credibility assessment is not patently wrong and must be upheld. *See Zurawski*, 245 F.3d at 887 (citing *Powers*, 207 F.3d at 435).

**4. Whether the Commissioner Sustained her Burden at Step 5.**

The ALJ found that the plaintiff retains the following residual functional capacity:

"to lift and carry no more than ten pounds, to sit approximately six hours in an eight-hour workday, and to stand and walk approximately six hours in an eight-hour workday. She should avoid continuous forceful gripping and continuous flexion and extension of the left elbow." (Tr. 29). The ALJ determined that the plaintiff was unable to perform her past relevant work as a certified nurse's aid, sewing machine operator and convenience store cashier.

The ALJ called upon vocational expert, Barbara Kimme, to identify occupations a hypothetical person with the plaintiff's residual functional capacity and vocational factors could perform. The vocational expert testified that such a person would be capable of performing the following sedentary unskilled occupations: information clerk, which exists in numbers of 2,000 in the regional economy, security guard, and office clerk which exists in numbers of 1,100 in the regional economy. After the administrative hearing and in response to the plaintiff's questions at the hearing, the vocational expert forwarded the relevant Dictionary of Occupational Titles (DOT) numbers to the plaintiffs attorney on October 6, 2005. (Tr. 307).

The plaintiffs letter to the ALJ dated November 21, 2005, (Tr. 303–05) attached the information that the vocational expert forwarded to the plaintiff's attorney listing the relevant DOT numbers related to security guard, office clerk and information clerk. (Tr. 307). As set forth in the list submitted by the vocational expert to the plaintiffs attorney of the sedentary, unskilled jobs available to the plaintiff, the security guard jobs are not relevant because they are all classified as light and/or semi-skilled SVP of 3 or greater. The general office clerk jobs are also not relevant as they are all classified as semi-skilled/SVP 3 or greater. As for the remaining position—information clerk—most of the seven listed information clerk posi-

tions are also not relevant either because they are semi-skilled/SVP of 3 or greater, or are considered light work. Within the list of information clerk positions, only one subset position is classified as both sedentary and unskilled—the telephone quotation clerk (financial institution), DOT # 237.367–046, which has a SVP of 2 and requires reasoning and language development levels of 3. (Tr. 304).

The plaintiff argues that "one identified job with numbers probably significantly less than 2000" cannot be considered a "significant number of jobs for the Commissioner to have met its burden at Step 5." (Plaintiffs Brief at 18). The Commissioner counters that courts have regularly held that numbers significantly smaller than 2000 can represent a significant number of jobs. (Commissioner's Brief at 19). See Lee v. Sullivan, 988 F.2d 789, 794 (7th Cir.1993) ("Lee's contention that 1,400 job positions are not a significant number is unsupported by caselaw."); Nix v. Sullivan, 744 F.Supp. 855, 863 (N.D.Ind.1990) (675 jobs are significant numbers), aff'd, 936 F.2d 575 (7th Cir.1991). In this case, it is unclear how many of the 2000 positions related to information clerk apply to the one remaining subset position of telephone quotation clerk.

Social Security Ruling 00–4p requires an ALJ who takes testimony from a vocational expert about the requirements of a particular job to determine whether the testimony is consistent with the DOT. As the court explained in Prochaska v. Barnhart, 454 F.3d 731, 735 (7th Cir.2006):

When a VE [vocational expert] or VS [vocational specialist] provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudica-

tor *will:* [a]sk the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT; and [i]f the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

Based on the vocational expert's testimony at the hearing, the ALJ concluded that three sedentary, unskilled occupations, namely information clerk, security guard and office clerk, were available to the plaintiff. During the hearing, the vocational expert did not have numbers for sedentary security guard positions and offered to provide these numbers as well as overall DOT numbers after the hearing. (Tr. 381–83). After the hearing, materials submitted by the vocational expert to the plaintiff's attorney demonstrated that only one of the three positions was unskilled and sedentary.

The ALJ's decision is incorrect in finding that the office clerk and security guard positions are available to the plaintiff as those jobs are not sedentary and unskilled. In addition, within the one available category, information clerk, only one subset position within the list of information clerk positions qualifies as both unskilled and sedentary—telephone quotation clerk (financial). However, the vocational expert did not provide any numbers for how many telephone quotations clerk positions are available out of the overall 2000 information clerk positions. The plaintiff specifically raised this issue on November 21, 2005, after the hearing and before the ALJ issued his decision. (Tr. 303–05). The ALJ failed to resolve the issue. Therefore, the court does not know how many telephone quotation clerk positions are available out of the overall 2000 information clerk positions.

The court must defer to an ALJ's findings if they are supported by "substantial evidence." *Jones,* 10 F.3d at 523. However, in this case, the Commissioner has failed to meet his burden at step five of the sequential evaluation. Therefore, the case must be remanded so that the ALJ can determine whether there is work in significant numbers in the economy which the plaintiff can perform given her residual functional capacity, age, education and work experience.

**5. Whether this Case Should Be Remanded For Consideration of New and Material Evidence.**

The plaintiff argues that this case should be remanded to the Commissioner for consideration of new and material evidence. The new evidence consists of records from psychiatrist Dr. Sangita Patel and a psychological evaluation from Steven Kaplan, Ph.D. This evidence was submitted to the Appeals Council and is submitted here at the district court level.[3] The court may remand this case to the Commissioner for further action "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see Binion,* 13 F.3d at 246.

In treatment notes dated April and July, 2006, Dr. Patel diagnosed the plaintiff with schizoaffective disorder, bipolar type. (Tr. 340–41). Dr. Kaplan's report discusses that the plaintiff has a long history of depression with symptoms of irritability, social withdrawal and severely flattened affect. (Tr. 342 [Exh. A–1] ). The plaintiff also admitted to experiencing auditory hallucinations in the form of voices which suggest that she harm herself or animals.

**3.** For unknown reasons, Dr. Kaplan's complete evaluation is not part of the administrative record, but is attached in its entirety to the plaintiff's brief as Exhibit A.

*Id.* The plaintiff experiences paranoid delusions and has an ongoing fear of social interaction. *Id.* According to the tests administered by Dr. Kaplan, the plaintiff has a verbal IQ score of 70, performance IQ score of 80, and a full scale IQ score of 73 (2nd, 9th and 4th percentiles respectively). (Exh. A–2). In addition, the plaintiff's Global Assessment Functioning score is 35–45. (Exh. A–5).

Dr. Kaplan stated that the plaintiff has marked to extreme difficulties in maintaining social functioning, marked deficiencies in concentration, persistence or pace, and should be expected to have several episodes of decompensation if placed in stressful circumstances. (Exh. A–5). Dr. Kaplan opined that the plaintiff is not capable of sustaining competitive employment. (Exh. A–5). Dr. Kaplan diagnosed the plaintiff with Major Depression—Chronic (DSM IV 296.32); Schizophrenia–Paranoid Type (DSM IV 295.30) and Borderline Intellectual Functioning (DSM IV V62.89). (Exh. A–4).

The plaintiff maintains that this evidence documents the plaintiff's "severe" mental impairments and that the ALJ should re-evaluate his determination that her mental·impairments are "not severe" based on this new evidence. The plaintiff also asserts that she may meet the Mental Retardation Listing 12.05C, involving a valid verbal performance or full scale IQ of 60 through 70. The plaintiff also states that her depression may be so severe that it meets the requirements of the Depression Listing, 12.04. The plaintiff maintains that this evidence further supports her contention that she does not have the intellectual capabilities necessary to perform the jobs relied upon by the vocational expert and the ALJ.

The Commissioner asserts that the plaintiff has not demonstrated good cause for failing to submit this evidence earlier. The Commissioner further argues that this evidence is neither new nor material and suggests, at most, a deterioration in the plaintiff's condition after the hearing. Moreover, the Commissioner contends that the plaintiffs attempt to argue that she may be mentally retarded is contradicted by Dr. Kaplan's evaluation. Dr. Kaplan determined that the plaintiff's IQ scores were well below average, but did not determine her to be mentally retarded. Instead, he diagnosed the plaintiff with borderline intellectual functioning.

In response to the Commissioner's assertion that the plaintiff has not demonstrated good cause for submitting Dr. Kaplan's evaluation until after the hearing, the plaintiff states that she could not afford cognitive testing. (Tr. 136). The plaintiff is represented by an attorney from Legal Action of Wisconsin. The plaintiff's attorney discovered that the plaintiffs educational records had been purged and attempted to identify an agency willing to test the plaintiff. (Tr. 354). The plaintiff's attorney advised the ALJ of this in writing and asked the ALJ to refer the plaintiff for a consultative evaluation to test her IQ. (Tr. 304). The ALJ did not do so and did not offer any reasons for rejecting the attorney's request for testing. The ALJ must explain his reasons for deciding not to seek such additional information and his reasons must be grounded in the evidence. *Schwartz v. Halter*, 134 F.Supp.2d 640, 658 (E.D.Pa.2001). Ultimately, the plaintiffs attorney referred the plaintiff for a psychological evaluation at a reduced rate, which was paid for by Legal Action of Wisconsin. (Reply Brief of Plaintiff at 7).

Given the circumstances, the court determines that good cause exists for the plaintiff's failure to submit this evidence earlier. Moreover, the court determines that the evidence is new and material, in particular, the plaintiff's test scores which test and assess her cognitive abilities and

limitations. The court is unable to determine what the ALJ or the Appeals Council would have decided if they had seen and considered Dr. Kaplan's report diagnosing the plaintiff with major depression—chronic, schizophrenia-paranoid type and borderline intellectual functioning. This evaluation is relevant to the determination of the severity of plaintiff's mental impairments and whether there are available jobs in the national economy that the plaintiff can perform.

In sum, the court determines that the evaluation of Dr. Kaplan constitutes new and material evidence and that the plaintiff has demonstrated good cause for the failure to incorporate the evidence into the record at the prior proceeding. The court, therefore, remands this case pursuant to 42 U.S.C. § 405(g), for reconsideration of this evidence.

### ORDER

NOW, THEREFORE, IT IS OR-DERED that the plaintiff's appeal be and hereby is **granted.**

IT IS FURTHER ORDERED that this case be and hereby is **remanded** to the Commissioner of the Social Security Administration for further proceedings consistent with this decision.

IT IS ALSO ORDERED that the Clerk of Court be and hereby is directed to enter judgment accordingly.